United States District Court
Middle District of Florida
Jacksonville Division

**VENTURE INVESTMENT PROPERTIES, LLC,**

      *Plaintiff,*

V.                               **NO. 3:14-CV-1536-J-34PDB**

**SCOTTSDALE INSURANCE COMPANY,**

      *Defendant.*

---

## Report & Recommendation

As part of the parties' settlement, they agreed the plaintiff is entitled to attorney's fees, costs, and reimbursement of appraisal expenses in amounts determined by the Court. Doc. 125-1.

Before the Court is the plaintiff's motion for a determination of those fees, costs, and expenses, Doc. 140; the defendant's response to the motion, Doc. 157; the plaintiff's reply to the response, Doc. 162; the defendant's supplemental response to the motion, Doc. 163; and the plaintiff's reply to the supplemental response, Doc. 166.[1]

The plaintiff requests a determination of $188,620 in attorney's fees, $37,962.50 in paralegal's fees, a contingency fee enhancement multiplier of no less

---

[1]The parties present supporting documents: an affidavit of the plaintiff's counsel, Doc. 140-1 at 1−3; billing records, Doc. 140-1 at 4−76; expense records, Doc. 140-1 at 77−81; an invoice from Claims Management Service for services of the appraiser selected by the plaintiff and the umpire and documents showing payment of the invoice, Doc. 140-2; orders in other actions, Docs. 140-3, 163-4, 166-1; a summary chart showing the times, rates, and fees of the plaintiff's attorneys and paralegals, Doc. 140-4; an affidavit and resume of the plaintiff's fee expert, Doc. 154-1; an invoice from an appraiser selected by the defendant, Doc. 163-2; and an invoice from the umpire, Doc. 163-3.

than 2 to 2.5, $25,760.92 in costs, and $33,610.50 in appraisal expenses. Doc. 140 at 17. The plaintiff's fee expert, Matthew Danahy, Esquire, states he has incurred $16,155 in rendering opinions and contends the defendant is responsible for paying that amount. Doc. 154-1 at 16.

The defendant agrees it must pay fees, costs, and reimbursement of appraisal expenses in amounts determined by the Court; agrees the requested hours as reduced by the plaintiff's fee expert are reasonable; agrees to pay the requested costs, and does not contest it is responsible for paying Danahy some amount.[2] Although the parties disagree whether the fee award is pursuant to Fla. Stat. § 627.428 (requiring court to award reasonable fees upon judgment in favor of insured against insurer) or under the settlement agreement, it makes no difference because both sides agree Florida law on fee assessment—the same whether pursuant to statute or contract— governs. Only four issues remain for the Court's determination: (1) whether the attorney and paralegal rates are reasonable; (2) whether a multiplier is appropriate; (3) whether the appraisal expenses are reasonable; and (4) whether Danahy's hours and rate are reasonable. Doc. 163.

The Court previously found it has diversity jurisdiction. Docs. 12, 13.

## I. Background

The plaintiff owns industrial property insured by the defendant. Doc. 20 ¶¶ 6, 19, 32. Through an independent adjuster, the plaintiff made three claims for loss and damage caused by thefts of copper wiring and other items that occurred on separate dates in 2013. Doc. 20 ¶¶ 8–11, 21–24, 34–37; Doc. 33 at 6. The defendant investigated the claims under a reservation of rights. Doc. 33 at 7. During the

---

[2]Through its agreement to pay $25,760.92 in costs and limiting its argument to the hours and rate of Danahy, the defendant appears to concede the parties intended the undefined term, "costs," in the settlement agreement to mean something broader than the limited "costs" available to a prevailing party in federal court under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920.

investigation, the defendant made payments on the claims. Doc. 30 ¶ 3; Doc. 140 at 1–2. Unsatisfied with the amounts, the plaintiff sued. Doc. 1.

The plaintiff asserted three breach-of-contract claims (one for each insurance claim). Doc. 20 ¶¶ 4–42. The defendant denied breach and asserted defenses, including that no damages were recoverable if they did not exceed the deductible, that a wear-and-tear exclusion applied, that any other occurrences contributing to the damages reduced the claim amounts, and that the plaintiff failed to provide requested documentation. Doc. 22 ¶¶ 4–50. After the action was filed, the defendant voluntarily paid the plaintiff an additional amount—but not the amount sought. Doc. 46 ¶ 3; Doc. 140 at 2. Throughout the dispute, the primary sticking point was the amount owed.[3]

The action began in state court in November 2014. Doc. 1-2. Except for an unusually heavy motion practice,[4] the action proceeded along a typical course, with

---

[3]The parties summarized the dispute in a joint pretrial statement:

This action arises out of a policy of insurance issued to the plaintiff by the defendant with effective dates October 5, 2012, through October 5, 2013. At all times relevant hereto, the plaintiff was a limited liability company organized and existing under the laws of the State of Florida.

The plaintiff brings this three-count action for breach-of-contract against the defendant alleging that the defendant failed to pay all benefits due under the subject insurance policy for damages sustained to the plaintiff's insured property as the direct result of three separate theft losses on or about January 30, 2013; April 11, 2013; and May 20, 2013. The plaintiff has asserted that the amount the defendant has paid is not sufficient to fully compensate the plaintiff for all of the damages where were caused by the three separate theft losses. The defendant denies that it owes any additional money under its policy and maintains that any damages claimed by the plaintiff in addition to what the defendant has already paid are damages that the plaintiff is not entitled to under the terms and conditions of the subject insurance policy.

Doc. 99 at 2 (party names substituted for party designations).

[4]Besides motions for extensions and motions for leave to file replies, the defendant filed a motion to strike the amended complaint and three motions in limine, and the plaintiff filed seven motions to compel, two motions for an order to show cause, a motion

the defendant filing removal papers and the parties filing pleadings and amended pleadings, attending a case management conference, hiring experts, undertaking discovery, participating in mediation, attending a final pretrial conference, filing final pretrial documents, participating in a settlement conference, undertaking appraisals as part of the settlement, and litigating post-settlement matters. No party filed a dispositive motion. The action came close to trial: on May 3, 2016, the Court canceled the trial scheduled to begin May 16, 2016, in favor of the settlement conference.

To settle, the parties agreed to resolution by a three-person panel (comprised of one appraiser selected by the plaintiff, one appraiser selected by the defendant, and one umpire selected by the two appraisers) charged with appraising "all components" of damages according to the insurance policy and rendering an award on the agreement of any two panelists. Doc. 125-1 at 1. The defendant agreed to not assert any coverage defense, to pay any award within 20 days, and to reimburse "[a]ll expense of appraisal." Doc. 125-1 at 1−2. The parties stipulated to the plaintiff's entitlement to prejudgment interest, attorney's fees, and costs in amounts determined by the Court. Doc. 125-1 at 1.

The plaintiff's appraiser and the umpire reached an appraisal award valuing the replacement cost of losses at $2,119,454.91 and the actual cash value of losses at $1,478,603.23. Doc. 132-1. After deducting $361,377.59 the defendant had already paid on the claims and $15,000 in deductibles, the plaintiff moved to confirm the appraisal award and sought judgment for $1,102,225.64 (the amount of unpaid

---

for a protective order, a motion for attorney's fees, a motion for sanctions, a motion for prejudgment interest, and a motion to hold the defendant in contempt.

In the previous motion for attorney's fees, the plaintiff sought attorney's fees under Fla. Stat. § 626.9373, arguing the defendant's post-complaint payment of a portion of a claim operated as a confession of judgment. Doc. 46. The plaintiff's counsel stated a "fair estimate" of attorney's fees up to July 8, 2015, was $70,000 "before consideration of a possible multiplier." Doc. 46 at 5. The Court deferred ruling on the motion pending a determination on liability. Doc. 73. The settlement obviates the need for the Court to return to that motion.

actual-cash-value losses). Doc. 133. After the defendant failed to timely pay, the plaintiff moved to enforce the settlement. Doc. 135. The Court confirmed the award, determined the plaintiff was entitled to judgment of $1,102,225.64, directed the defendant to pay that amount, and deferred entry of judgment until after determinations of prejudgment interest, attorney's fees, and costs. Doc. 137. The parties later agreed on $188,529.57 as the amount of prejudgment interest. Doc. 152.

The defendant has paid the judgment amount of $1,102,225.64 and the prejudgment interest amount of $188,529.57. Docs. 147, 155, 160.

## II.    The Parties' Positions

### A.    *The Plaintiff's Motion*

The plaintiff's calculation of $188,620 in attorney's fees and of $37,962.50 in paralegal's fees, for $226,582.50, is based on the following hours, rates, and calculations:

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Andrew McDonald, Esquire | 458.5 | $375 | $171,937.50 |
| Bob Freemon, Esquire | 22.4 | $500 | $11,200 |
| Ron Hobgood, Esquire | 10 | $450 | $4500 |
| David Barnhill, Esquire | 2.4 | $350 | $840 |
| Gary Miller, Esquire | 0.3 | $475 | $142.50 |
| Paralegals | 303.7 | $125 | $37,962.50 |

Doc. 140-4. All of the billers are with Freemon & Miller, a Tampa law firm. Doc. 140-1 at 4.

Citing Rule 4-1.5(b)(1) of the Rules Regulating The Florida Bar ("Factors to Be Considered in Determining Reasonable Fees and Costs"), the plaintiff argues the rates are reasonable because: they follow prevailing market rates "in the area in and around Florida"; Freemon & Miller has more than a century of combined experience with insurance litigation; Freemon & Miller is one of the few firms in the area with

first-party-insurance-claim expertise; the rates follow the rates of firms in the area with like expertise; the claims were novel, complex, and difficult; insurers have stipulated like rates are reasonable in like cases; and various Florida courts have awarded Freemon & Miller attorneys fees that are consistent with the rates. Doc. 140 at 8–9, Doc. 140-3.

Citing the main Florida Supreme Court cases on reasonable attorney's fees— *Fla. Patient's Comp. Fund v. Rowe*, 472 So. 2d 1145 (Fla. 1985), and *Standard Guar. Ins. Co. v. Quanstrom*, 555 So. 2d 828 (Fla. 1990)—the plaintiff argues a contingency fee risk multiplier is warranted. Doc. 140 at 12–14. Besides repeating reliance on the Rule 4-1.5(b)(1) factors and the expertise of Freemon & Miller attorneys, the plaintiff points to the general superior financing and organization of the insurance industry that makes litigating against insurers expensive and difficult, contends it possessed "limited financial ability to hire an attorney at the typical rate of those who perform this type of work," and asserts it could not have "enforce[d] its rights … without an attorney accepting the case on a contingency fee basis." Doc. 140 at 12–14.

The plaintiff argues a multiplier of 2 to 2.5 is warranted. Doc. 140 at 15–16. The plaintiff argues a high multiplier is warranted because "it was clear the case was unlikely to be resolved quickly or easily"; the defendant "rigorously and aggressively" defends actions to recover for property damage; during the claims process, the plaintiff hired an adjuster who could not resolve the matter; the plaintiff's counsel had to file numerous motions to obtain documents; the defendant had investigated and documented that it had paid all that was due; and the plaintiff would have had trouble finding counsel in the area to take on the representation. Doc. 140 at 15–16.

## B.    *The Plaintiff's Evidence*

### 1.    *Affidavit of Andrew McDonald*

The plaintiff provides an affidavit of Andrew McDonald, Esquire—the primary biller in the action. Doc. 140-1. Besides attesting to the hours and rates in the chart

above, Doc. 140-1 ¶¶ 5, 6, he attests to the following facts. He is an associate with Freemon & Miller. Doc. 140-1 ¶ 3. He has been licensed to practice law in Florida since 2004. Doc. 140-1 ¶ 1. He has more than 12 years' experience representing plaintiffs and defendants in insurance litigation. Doc. 140-1 ¶ 2. The plaintiff retained Freemon & Miller in October 2014. Doc. 140-1 ¶ 4. The plaintiff explained the status of the dispute and that it could not pay attorney's fees except on a contingency-fee basis. Doc. 140-1 ¶ 8. The plaintiff has paid nothing, and the firm has advanced the $25,760.92 in costs and the $33,610.50 for the appraisal expenses. Doc. 140-1 ¶¶ 8, 11, 12. The firm viewed success "doubtful" and "unlikely." Doc. 140-1 ¶ 9. Because of "immense" property damage and the defendant's refusal to pay, litigation was the only way to resolve the dispute. Doc. 140-1 ¶ 9.

Citing mostly actions from other Florida counties, McDonald states other courts or arbitrators in recent actions have awarded fees based on the requested rates. Doc. 140-1 ¶ 5; Doc. 140-3. He opines the rates "are reasonable based upon my knowledge of what similarly experienced counsel have been awarded as … reasonable in first party breach of insurance contract cases." Doc. 140-1 ¶ 5. He opines, "Due to the complexity of this case in terms of legal and factual issues, the firm's efforts were reasonable and necessary to properly represent Plaintiff and prosecute its claim." Doc. 140-1 ¶ 7. Without providing information about the paralegals, he opines they are "experienced" and their $125 hourly rate is reasonable. Doc. 140-1 ¶ 10.

## 2. *Affidavit of Matthew Danahy*

The plaintiff also provides an affidavit of Matthew Danahy, Esquire, as a fee expert. Doc. 154-1. He attests to the following facts concerning his background. He received a Bachelor of Arts degree from the University of Florida in 1983 and a Juris Doctor degree from Stetson University College of Law in 1986. Doc. 154-1 ¶ 2. He is an attorney in good standing, is licensed to practice in Florida, and is admitted to this Court (and has been since 1987). Doc. 154-1 ¶¶ 1, 2. He is Board Certified by the Florida Bar in Civil Trial Law and is certified by the National Board of Trial Advocacy

as a Civil Trial Advocate. Doc. 154-1 ¶ 3. Martindale-Hubbell rates him "AV." Doc. 154-1 ¶ 3. For the last 15 years, he has focused exclusively on first-party insurance disputes for insureds against insurers throughout Florida. Doc. 154-1 ¶ 4. Before then, he represented insureds and insurers. Doc. 154-1 ¶ 4. He maintains a current knowledge of and regularly lectures on first-party insurance disputes. Doc. 154-1 ¶ 4. He has served as an umpire and appraiser under contractual provisions common in insurance contracts and has litigated "numerous" cases that resulted in appraisals. Doc. 154-1 ¶ 5. Windstorm Insurance Network has certified him as an umpire. Doc. 154-1 ¶ 5. He is familiar with "the nuances of the appraisal process, both pre-suit and post-suit." Doc. 154-1 ¶ 5. He has served as an expert on attorney's fees before. Doc. 154-1 ¶ 6.

Danahy attests to the following facts concerning the bases for his opinions. In October 2016, McDonald asked him to serve as a fee expert. Doc. 154-1 ¶ 7. He talked to McDonald and Freemon about details of the representation and reviewed the pleadings, motions, orders, correspondence, emails, deposition transcripts, discovery materials, legal research, billing records, and the fee agreement. Doc. 154-1 ¶ 8. He also talked to the plaintiff's owner and attorneys who "primarily, if not exclusively handle first party claims in Florida," including in this Court. Doc. 154-1 ¶ 9. And he reviewed "attorney's fee survey information" and "attorney's fees orders" in other actions in Duval County and this Court. Doc. 154-1 ¶ 9.

Danahy provides the following opinions concerning the rates and Rule 4-1.5(b)(1) factors. Based on his background, preparation, personal knowledge, and the factors, the rates are reasonable. Doc. 154-1 at 3−4. On the first factor (time and labor required, novelty and difficulty of issues, and skill required to perform services properly), the action involved significant losses, a lengthy claim investigation, and coverage defenses, all of which would have made a trial likely. Doc. 154-1 at 5. "Such claims … require technical knowledge and mastery of multiple fields and specialties." Doc. 154-1 at 5. The building was unused, in a high-crime area, and in disrepair at

the time of the losses, providing additional challenges. Doc. 154-1 at 5. The "excellent" result achieved without a trial—an appraisal award greater than the plaintiff had sought, interest, attorney's fees, and costs—demonstrates the skill of the plaintiff's counsel. Doc. 154-1 at 6.

On the second factor (the likelihood that an attorney's acceptance of employment will preclude other employment), the action was likely to require significant time and resources from a small firm and be "contentious and hotly disputed." Doc. 154-1 at 6. The plaintiff's counsel incurred costs exceeding $65,000; "When attorneys are required to devote significant money to one client's case, it leave [sic] less resources for other clients." Doc. 154-1 at 6.

On the third factor (the fee customarily charged in the area for similar services), attorneys with a comparable backgrounds and ranges of experience (attorneys with 13 to 36 years' experience who primarily or exclusively handle first-party insurance disputes in Florida) typically charge between $300 and $600 an hour. Doc. 154-1 at 7. Paralegals in the field typically charge between $125 and $150 an hour. Doc. 154-1 at 7. "[T]here are few Duval County attorneys who primarily or exclusively handle first[-]party claims and coverage disputes for insureds." Doc. 154-1 at 7. The plaintiff's owner also found there were "very few qualified and competent local attorneys who represent insureds in these types of cases." Doc. 154-1 at 7.

On the fourth factor (the amount involved and the results obtained), the action involved more than $1 million, which counsel recovered for the plaintiff with pre-judgment interest, attorney's fees, and costs, without going to trial. Doc. 154-1 at 8.

On the fifth factor (time limitations imposed by the client or the circumstances), the plaintiff "needed the money from this litigation to be indemnified for the damages to its warehouse, which left it devalued and unusable." Doc. 154-1 at 8. The defendant caused significant payment delay, while neither the plaintiff nor its counsel caused any delay. Doc. 154-1 at 8–9.

On the sixth factor (the nature and length of the professional relationship), the plaintiff and counsel both anticipate the case will be the only time counsel will represent the plaintiff. Doc. 154-1 at 9. The representation involved a significant risk because it involved a contingency-fee agreement. Doc. 154-1 at 9. The defendant's counsel "gets regular and repeat business" from the defendant and is paid quarterly with no risk. Doc. 154-1 at 9.

On the seventh factor (the experience, reputation, and ability of the attorneys), the plaintiff's attorneys primarily, if not exclusively, handle first-party insurance disputes. Doc. 154-1 at 9. They have "excellent" reputations and are experienced in handling the types of claims at issue in this case. Doc. 154-1 at 9. Unlike many attorneys who do not specialize in the field, they are willing to "spend both the time and the costs necessary to obtain the best possible result." Doc. 154-1 at 9–10. The results obtained reflect their abilities. Doc. 154-1 at 10.

On the eighth factor (whether the fee is fixed or contingent), the action involves a contingent-fee agreement, which presented a significant risk of nonpayment. Doc. 154-1 at 10.

Danahy provides the following opinions concerning the hours. The "hours reasonably and necessarily incurred to prosecute" the action were: McDonald, 454.6; Miller, 0.3; Barnhill, 2.4; Freemon, 22.3; Hobgood, 10; and the paralegals, 293.5. Doc. 154-1 at 10–11. Excluded are 3.9 hours of McDonald's time, 0.1 hour of Freemon's time, and 10.2 hours of the paralegals' time to account for vague entries, clerical tasks, duplicative time, and time spent before the plaintiff retained Freemon & Miller. Doc. 154-1 at 10 n.2. The records for the defendant's counsel—showing 797.7 billed hours—support finding reasonable Freemon & Miller's hours as reduced. Doc. 154-1 at 15–16.

Danahy provides the following opinions concerning the multiplier. Considering the factors in *Quanstrom*, a multiplier is warranted. Doc. 154-1 at 11–15. On the first

factor (whether the market requires a contingency fee multiplier to obtain competent counsel), the market requires a multiplier because few Duval County attorneys, and only a few dozen statewide, primarily or exclusively represent insureds in first-party insurance disputes. Doc. 154-1 at 12. Such experience is "important and necessary." Doc. 154-1 at 12. Danahy, Freemon & Miller, and any other attorney who handles first-party insurance disputes (including in Duval County and other areas of North Florida) would not have represented the plaintiff without the ability to recover a multiplier. Doc. 154-1 at 12. That the defendant hired counsel from Orlando suggests "even defense counsel for these types of claims was not available, or of limited availability," in the area. Doc. 154-1 at 12. Actions like this are likely to be "risky, time-consuming[,] and expensive." Doc. 154-1 at 12–13.

On the second factor (whether the attorney could mitigate the risk of nonpayment), the plaintiff's counsel could not have mitigated the risk of nonpayment because the plaintiff "did not have money to hire a lawyer or to pay costs to prosecute the case" and required a contingency agreement. Doc. 154-1 at 13.

On the third factor (whether any of the *Rowe* factors are applicable), "all of the *Rowe* factors are met in this case, especially" the amount involved, the results obtained, and the type of fee arrangement. Doc. 154-1 at 13.

Even if the Court follows recent Florida appellate decisions indicating a multiplier is warranted only in rare or exceptional cases, this case is "extraordinary" and warrants a multiplier because it involved an extensive investigation by the defendant, early assertion of potential coverage defenses, a building in disrepair, and uninteresting facts making for a tedious trial. Doc. 154-1 at 14. The action had the potential to be "lengthy, expensive[,] and hotly litigated." Doc. 154-1 at 14.

A multiplier of 2 is warranted because success was unlikely (or at best even) at the outset. Doc. 154-1 at 14–15.

At the end of the affidavit, Danahy states,

I was retained in the matter on October 17, 2016[,] at my normal hourly rate of $500.00 …. I advised [the plaintiff's counsel] when he retained me that I expected to be paid for my time, and that remains true. [He] agreed to [] my normal hourly rate. To date, I have incurred 33.5 hours … at my normal rate of $500.00 resulting in a total charge of $16,155.00. Pursuant to Florida law, under these circumstances, my time as an expert in this matter is a taxable cost to be paid by Scottsdale, *Stokus v. Phillips*, 651 So.2d 1244 (Fla. 2nd DCA 1995); *Rock v. Prairie Building Solutions, Inc.*, 854 So.2d 722 (Fla. 2nd DCA 2003).

Doc. 154-1 at 16. In the cases he cites, the district court of appeal held an award of expert witness fees under Fla. Stat. § 92.231 (providing expert fees "shall be taxed as costs") is not discretionary if the testifying attorney expects to be compensated for his testimony. *Stokus*, 651 So. 2d at 1246; *Rock*, 854 So. 2d at 724.

3.    *Appraiser Expenses*

To support its request for a determination of $33,610.50 for appraiser expenses, the plaintiff submits: (1) an invoice from Claims Management Service reflecting that the appraiser selected by the plaintiff worked 127.9 hours at $250 an hour for $31,975, Claims Management Service billed $1250 for the umpire, and the appraiser spent $385.50 for travel, meals, and lodging; (2) a copy of a $33,610.50 check from Freemon & Miller to Claims Management Service; and (3) a copy of a cover letter from Freemon & Miller to someone with Claims Management Service stating the check was enclosed. Doc. 140-2.

**C.    *The Defendant's Response***

The defendant argues a multiplier is unwarranted because the plaintiff has not produced evidence of its fee arrangement with counsel, factors adequately accounted for in the lodestar amount cannot also support a multiplier, and the plaintiff relies on unsupported assertions. Doc. 157 at 3–6. The defendant "disputes the reasonableness" of the rates and indicated it would supplement its response with its own expert affidavit. Doc. 157 at 7.

### D.    *The Plaintiff's Reply*

With leave of the Court, the plaintiff filed a reply. Doc. 162. The plaintiff observes the defendant failed to timely respond to the motion, and its response is "devoid of any detail" and consists only of "a blanket refutation and rejection of [the] [p]laintiff's [m]otion and the sworn affidavit filed in support." Doc. 162 at 1–2. The plaintiff observes the defendant failed to identify its contemplated expert or give a date for supplementing the response with the expert's opinion. Doc. 162 at 2. The plaintiff contends the defendant's failure to provide an affidavit leaves Danahy's affidavit uncontroverted. Doc. 162 at 2.

### E.    *The Defendant's Supplemental Response*

The following month, without leave of the Court, the defendant filed a supplemental response. Doc. 163. The defendant asserts, "The parties have conducted conferences regarding the matters remaining before this Honorable Court and [the defendant] has agreed to several matters[,] leaving a narrow list of issues to remain pending." Doc. 163 at 1.

Besides resolving several issues (as explained in the opening paragraphs of this report and recommendation), the defendant suggests $12,000 as a more reasonable amount for appraiser reimbursement than the amount requested ($33,610.50) in light of the expenses of the appraiser it had selected ($11,309.22) and the umpire ($2500). Doc. 163 at 2. The defendant provides: the same invoice the plaintiff provided from Claims Management Service, Doc. 163-1; an invoice from the appraiser selected by the defendant indicating he charged $2646.72 for mileage, office expenses, photocopies, telephone calls, and travel expenses, and $8662.50 as an adjuster's fee, Doc. 163-2; and an invoice from the umpire indicating he charged $2500 for 10 hours of work, Doc. 163-3.

The defendant contends the hours Danahy spent and the rate he charges are unreasonable, suggests compensating him instead for only 10 hours at $425 an hour,

and provides orders from other actions for asserted support for those figures. Doc. 163 at 3–4; Doc. 163-4.

The defendant again disputes the reasonableness of the rates and again states it will supplement its response with an expert affidavit, Doc. 163 at 4, but never did.

## F.     The Plaintiff's Reply to the Supplemental Response

The plaintiff moved to strike the supplemental response or for leave to reply to it. Doc. 164. Because the supplemental response narrows issues and otherwise provides information for resolving the dispute, the Court did not strike it but permitted the plaintiff to reply to it. Doc. 165.

The plaintiff replies, "The briefest review of the documents filed in this case will show Defendant's consistent pattern of failing to adhere to Court-ordered deadlines and mandates." Doc. 166 at 2. The plaintiff repeats the defendant's failure to provide an affidavit leaves Danahy's affidavit uncontroverted. Doc. 166 at 2.

For the appraisal expenses, the plaintiff explains the appraiser it selected "spent 127.9 hours through the appraisal process." Doc. 166 at 3. Without evidence, the plaintiff states the work included inspecting the property, which comprised multiple warehouses totaling over 286,000 square feet, "meetings with the umpire and [the defendant's] appraiser, research, providing estimates and reports requested by [the defendant's] appraiser, and communications with various contractors and State officials" to render and present his valuation of damages to the umpire in the appraisal process. Doc. 166 at 3. The plaintiff observes the invoice for the appraiser selected by the defendant does not indicates how many hours he worked, leaving the plaintiff unable to determine that number. Doc. 166 at 3.

For Danahy's expert fees, the plaintiff contends two orders it provides support $500 an hour while the defendant provides irrelevant orders to try to mislead the Court. Doc. 166 at 2−3.

### III.    Law & Analysis

### A.    *Attorney's Fees*

#### 1.    *Applicable Law*

In a diversity action, a federal court must apply state law in evaluating a claim for attorney's fees sounding in state law. *Trans Coastal Roofing Co. v. David Boland, Inc.*, 309 F.3d 758, 760 (11th Cir. 2002). Both a claim for attorney's fees based on Fla. Stat. § 627.428 and a claim for attorney's fees based on a contractual provision sound in state law. *See id.* (section 627.428); *In re Sure-Snap Corp.*, 983 F.2d 1015, 1017–18 (11th Cir. 1993) (contract). Here, whether the claim for attorney's fees is based on section 627.428 (as the plaintiff contends) or the contractual provision of the settlement agreement (as the defendant contends), the claim sounds in state law, so state law governs. No party contends otherwise.

#### 2.    *Lodestar*

In *Fla. Patient's Comp. Fund v. Rowe,* the Florida Supreme Court found that the federal lodestar approach is a "suitable foundation for an objective structure" upon which to base an attorney's fee award. 472 So. 2d 1145, 1150 (Fla. 1985). The court instructed that, in calculating reasonable fees, a trial court must determine the number of hours reasonably expended by the attorney, determine a reasonable hourly rate for those services, and then multiply the figures to arrive at a "lodestar" amount. *Id.* at 1150–51.

The court explained the criteria in Disciplinary Rule 2-106(b) of the Florida Bar Code of Professional Responsibility (now Rule 4-1.5(b)(1) of the Rules Regulating The Florida Bar) should be used to calculate the lodestar. *Id.* at 1150. The criteria are:

> (A)    the time and labor required, the novelty, complexity, and difficulty of the questions involved, and the skill requisite to

perform the legal service properly;

(B)    the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(C)    the fee, or rate of fee, customarily charged in the locality for legal services of a comparable or similar nature;

(D)    the significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained;

(E)    the time limitations imposed by the client or by the circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client;

(F)    the nature and length of the professional relationship with the client;

(G)    the experience, reputation, diligence, and ability of the lawyer or lawyers performing the service and the skill, expertise, or efficiency of effort reflected in the actual providing of such services; and

(H)    whether the fee is fixed or contingent, and, if fixed as to amount or rate, then whether the client's ability to pay rested to any significant degree on the outcome of the representation.

Rule 4-1.5(b)(1).[5]

---

[5]Citing *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the court observed, "These factors are essentially the same as those considered by the federal courts in setting reasonable attorneys' fees. The United States Supreme Court has sanctioned the use of the *Johnson* factors by federal courts." *Rowe*, 472 So. 2d at 1150 n.5.

After *Rowe*, the United States Supreme Court criticized the *Johnson* method as a means of determining reasonable attorney's fees to the extent it operated separate from the lodestar method, explaining, "Its major fault was that it gave very little actual guidance to district courts. Setting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563 (1986), *supplemented by*, 483 U.S. 711 (1987). The Florida Supreme Court endorsed the factors not separately from the lodestar method but as part of the lodestar method.

The court explained that, for the rate part of the lodestar equation, a court should consider all of the factors except the time and labor required, the novelty and the difficulty of the question, the results obtained, and whether the fee is fixed or contingent. *Id.* at 1150−51. The court held the "party who seeks the fees carries the burden of establishing the prevailing 'market rate,' i.e., the rate charged in that community by lawyers of reasonably comparable skill, experience and reputation, for similar services." *Id.* at 1151; *see Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299, 1303−04 (11th Cir. 1988) (setting forth same burden when using federal lodestar approach).

Here, through McDonald's affidavit, Doc. 140-1, and Danahy's affidavit, Doc. 154-1, supplemented by the Court's own knowledge, the plaintiff has shown the rates are prevailing market rates as gleaned from the applicable Rule 4-1.5(b)(1) factors.[6] Although the skill needed to properly represent the plaintiff is exaggerated in the plaintiff's submissions insofar as this action was no more difficult than other commercial actions this Court encounters, an understanding of commercial property

---

*See Rowe*, 472 So. 2d at 1150−51.

[6]Unpersuasive for establishing prevailing market rates are the orders presented by the parties. Even assuming the time periods in the orders presented by the plaintiff matched the time periods here (some work in 2014, some work in 2015, and some work in 2016), all but one of the orders are from other areas, which do not serve to establish the prevailing market rate "in the locality," *see* Rule 4-1.5(b)(1) (quoted), which in this action is Jacksonville, Duval County. *See* Doc. 140-3 at 1−10 (Pasco County), 11−21 (Leon County), 22−23 (Martin County), 24−25 (Palm Beach County), 26−27 (Pinellas County), 28−34 (Pinellas County), 35−58 (Orange County). In one arbitration decision, the primary biller in this action—McDonald—served as the fee expert, and his opinions were rejected in favor of lower rates, so it is unclear why the plaintiff offers the decision. *See* Doc. 140-3 at 5−6. In the only order from Duval County, the order includes no description of the action, no reasonableness analysis, and no indication of whether the attorneys there had experience and reputations similar to the attorneys here. *See* Doc. 140-3 at 59−61. Without those details, it offers nothing persuasive.

The orders the defendant presents are from other areas, and all are outdated. *See* Doc. 163-4 at 1−5 (Hillsborough County, 2013), 6−8 (Bay County, 2013), 9−10 (Hillsborough County, 2011), 11−14 (Pinellas County, 2010), 15−18 (Polk County, 2010), 19−25 (Tampa Division, 2010).

insurance, commercial property claims, and commercial property damages was at least helpful. Because Freemon & Miller is a small firm, representing the plaintiff made it more likely it would have to decline representation of others (though the plaintiff offers no evidence of actual declination). The rates are within Jacksonville rates for comparable legal services as evidenced by Danahy's personal experience, communications with attorneys here, and review of surveys, Doc. 154-1 at 7, albeit in the Court's experience at the high end (with the high end justified by expertise in first-party-insurance disputes). The amount in controversy was high, with more than $1 million at issue. Freemon & Miller was the only firm for the plaintiff and therefore had responsibility for every aspect of the action. Acting quickly was important to the extent the money would help the plaintiff in getting the property repaired and used again. Freemon & Miller has never represented the plaintiff and likely will not again. The attorneys have 13 to 36 years' experience, the paralegals are "experienced," the attorneys and paralegals specialize in insurance litigation, and together the attorneys and paralegals prosecuted the action with diligence and determination, as evidenced by the filings.

While the plaintiff has shown the rates are prevailing market rates, the defendant, despite twice indicating it would provide its own expert affidavit for the Court's consideration, has presented no evidence to counter the plaintiff's evidence. Whether the Court gleans from that failure the defendant abandoned its challenge to the rates or could not find an expert to offer contrary opinions, or finds Danahy's affidavit uncontroverted, the result is the same.

Reasonable hourly rates are $500 for Freemon; $475 for Miller; $450 for Hobgood; $375 for McDonald; $350 for Barnhill; and $125 for the paralegals. Using those rates and the hours as reduced by the plaintiff's expert (after the plaintiff filed its motion) and ultimately agreed to by the defendant (**783.1**), the lodestar is **$223,795**:

| Name | Time (Hours) | Rate | Total |
|---|---|---|---|
| Andrew McDonald, Esquire | 454.6 | $375 | $170,475 |
| Bob Freemon, Esquire | 22.3 | $500 | $11,150 |
| Ron Hobgood, Esquire | 10 | $450 | $4500 |
| David Barnhill, Esquire | 2.4 | $350 | $840 |
| Gary Miller, Esquire | 0.3 | $475 | $142.50 |
| Paralegals | 293.5 | $125 | $36,687.50 |
| **Total** | **783.1** | | **$223,795** |

*3. Multiplier*

In *Rowe*, the Florida Supreme Court held that once a court arrives at the lodestar figure, "it may add or subtract from the fee based upon a 'contingency risk' factor and the 'results obtained.'" 472 So. 2d at 1151.

Later, in *Standard Guar. Ins. Co. v. Quanstrom*, 555 So. 2d 828 (Fla. 1990), the Florida Supreme Court "reaffirmed the use of the contingency risk multiplier in certain cases" but "recognized the need to modify the application of the contingency risk multiplier based on the type of case under consideration." *Bell v. U.S.B. Acquisition Co., Inc.*, 734 So. 2d 403, 407 (Fla. 1999). The court found "it appropriate to place attorney's fee cases into the following three categories: (1) public policy enforcement cases; (2) tort and contract claims; and (3) family law, eminent domain, and estate and trust matters." *Quanstrom*, 555 So. 2d at 833.

The court explained that, for contract actions, a court should consider three factors to decide if a multiplier is necessary: "(1) whether the relevant market requires a … multiplier to obtain competent counsel; (2) whether the attorney was able to mitigate the risk of nonpayment in any way; and (3) whether any of the factors … in *Rowe* are applicable, especially, the amount involved, the results obtained, and the type of fee arrangement between the attorney and his client." *Id.* at 834. The court held evidence of the factors "must be presented to justify the utilization of a multiplier." *Id.* The court continued: "[T]he multiplier in *Rowe* should be modified as follows: If the trial court determines that success was more likely than not at the

outset, it may apply a multiplier of 1 to 1.5; if the trial court determines that the likelihood of success was approximately even at the outset, the trial judge may apply a multiplier of 1.5 to 2.0; and if the trial court determines that success was unlikely at the outset of the case, it may apply a multiplier of 2.0 to 2.5." *Id.* The court concluded, "We have identified these categories to illustrate that different criteria for different types of cases must be considered in calculating attorney's fees. We emphasize that the principles to be utilized in computing these fees must be flexible to enable the courts to consider rare and extraordinary cases with truly special circumstances." *Id.*

Later that year, in *Sun Bank of Ocala v. Ford*, the Florida Supreme Court, addressing contract actions, explained, "Before adjusting for risk assumption, there should be evidence in the record, and the trial court should so find, that without risk-enhancement [the] plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." 564 So. 2d 1078, 1079 (Fla. 1990) (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 731 (1987)). "Therefore," the court continued, "the existence of a contingent-fee agreement between attorney and client does not automatically require application of a multiplier." *Id.* The court emphasized "the critical factor for the court to consider in deciding whether to apply a multiplier was the party's difficulty in finding counsel without risk enhancement." *Bell*, 734 So. 2d at 409 (discussing *Sun Bank*). The court found the trial judge's rejection of a multiplier "reasonable and proper," explaining:

> The instant case is in the nature of a contract case. We are not aware of any situations where commercial banks have had difficulty finding attorneys to represent them. Indeed, from the myriad of cases involving banks it seems as though attorneys are anxious to represent them. There might be a preference not to accept certain individual cases, but any reluctance generally yields to the reward of gaining other cases and for the business representing a bank engenders.
>
> The instant trial judge rejected the contention that a multiplier was appropriate. He found his duty to be to set a reasonable attorney's fee according to the terms of the promissory note. He arrived at the figure

by utilizing a rate of one hundred fifty dollars per hour for the time reasonably spent. In this case and under the circumstances presented the award was reasonable and proper.

*Sun Bank*, 564 So. 2d at 1079−80.

Later, in *State Farm Fire & Cas. Co. v. Palma*, the Florida Supreme Court, citing *Quanstrom*, made clear, "The application of a contingency fee multiplier is discretionary with the trial court." 629 So. 2d 830, 833 (Fla. 1993). And in *Bell*, the court explained a "primary rationale for the contingency risk multiplier is to provide access to competent counsel for those who could not otherwise afford it," and a "court may consider applying a multiplier as a 'useful tool' in determining a reasonable fee." 734 So. 2d at 411–12.

Here, a multiplier is unwarranted because the Court cannot find that, without risk-enhancement, the plaintiff would have faced substantial difficulties in obtaining competent Jacksonville counsel. Danahy opines risk-enhancement was necessary to attract counsel specializing in the representation of insureds in first-party-insurance disputes but offers nothing other than a conclusory suggestion that no competent (as opposed to specialized) counsel would have represented the plaintiff (a company with industrial property assets) in this action (a dispute lacking novel legal issues and involving primarily how much—not whether—an insurance company should pay for property damage) without risk-enhancement. Neither evidence nor the Court's experience supports that suggestion.

Even if discretion were available, nothings suggests any multiplier—much less the highest range requested by the plaintiff—should be used to arrive at a fee award that is reasonable. As factors that purportedly make this action exceptional, Danahy points to the defendant's "extensive investigation" and potential coverage defenses, the state of the property at issue (in disrepair and with preexisting damage), the uninteresting facts making for what would have been a tedious trial, and the potential for the action to be long, expensive, and "hotly litigated." Doc. 154-1 at 14.

Those circumstances, even combined, do not make an exceptional case.

The lodestar amount without enhancement establishes reasonable fees.[7] No multiplier is warranted.

## B.  *Appraiser Expenses*

The parties do not provide the standard by which the Court should determine appraiser expenses (reasonableness versus amount paid in good faith regardless of reasonableness), though both parties appear to presume a reasonableness standard.

In the indemnity context, courts interpolate a reasonableness requirement into agreements "to guard against moral hazard—the tendency to take additional risks (or run up extra costs) if someone else pays the tab." *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 521 (7th Cir. 1999); *accord R.W. King Constr. Co.*

---

[7]For the federal lodestar approach, the United States Supreme Court has taken a more restrictive view of when a multiplier is warranted. It has rejected enhancement of the lodestar for contingency risk, *see City of Burlington v. Dague*, 505 U.S. 557, 567 (1992); emphasized the "strong presumption that the lodestar figure is reasonable," *see Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010) (internal quotation marks omitted); and held enhancement is available only in "rare and exceptional circumstances," *see id.* at 552, 554 (internal quotation marks omitted).

Here, the plaintiff has failed to show a multiplier is warranted under the more restrictive view for the same or similar reasons it has failed to show a multiplier is warranted under *Quanstrom* and the other Florida Supreme Court cases.

Florida District Courts of Appeal have recently followed the United States Supreme Court's approach, rejecting application of a multiplier in the absence of rare or exceptional circumstances. *See, e.g.*, *Sawgrass Mut. Ins. Co. v. Mone*, 201 So. 3d 182, 184–85 (Fla. 5th DCA 2016); *Fla. Peninsula Ins. Co. v. Wagner*, 196 So. 3d 419, 421–23 (Fla. 2d DCA 2016); *Federated Nat'l Ins. Co. v. Joyce*, 179 So. 3d 492, 493–94 (Fla. 5th DCA 2015); *State Farm Fla. Ins. Co. v. Alvarez*, 175 So. 3d 352, 357–59 (Fla. 3d DCA 2015). The Florida Supreme Court has accepted review of the issue, briefs were filed last year, and a decision is pending. *See Joyce v. Federated Nat'l Ins. Co.*, No. SC16-103.

If the Court concludes a multiplier is warranted under the less restrictive approach, deferring ruling on the plaintiff's motion until the Florida Supreme Court issues a decision is warranted to obtain clarification on the standard for applying a multiplier under Florida law in a contract action.

*v. City of Melbourne*, 384 So. 2d 654, 655 (Fla. 5th DCA 1980). Expenses must be commercially reasonable; "that is, were they fees that commercial parties would have incurred and paid knowing that they had to cover the outlay themselves." *Medcom*, 200 F.3d at 521. Payment of expenses is prima facie evidence they are reasonable, causing the burden to shift to the other side to demonstrate they are unreasonable. *Travelers Cas. & Surety Co. of Am. v. Grace & Naeem Uddin, Inc.*, No. 08-61868-CIV, 2009 WL 6066973, at *1−2 (S.D. Fla. Dec. 1, 2009) (unpublished).

Borrowing from that context—analogous to the context here—the plaintiff, through documentation indicating it paid $33,610.50 to Claims Management Service, has presented prima facie evidence the appraisal expenses are reasonable, causing the burden to shift to the defendant to demonstrate they are unreasonable. It has failed to do so. That the umpire charged much less ($2500) does not suffice because his role differed from that of the appraisers selected by the parties. *See* Doc. 125-1 (settlement agreement explaining roles). That the appraiser selected by the defendant charged much less ($11,309.22) does not suffice on its own; nothing indicates the hours he spent from which any inference could be drawn the appraiser selected by the plaintiff spent an unreasonable amount of time; and nothing indicates the rate he charged from which any inference could be drawn the appraiser selected by the plaintiff charges too much.

A determination of **$33,610.50** for appraisal expenses is warranted.

## C.    Fee Expert[8]

Unlike the appraiser expenses, the plaintiff has not shown it has paid Danahy for his expert services. Danahy provides his resume, a summary of work he did to formulate his opinions, and the statement he has spent 33.5 hours at his "normal" hourly rate of $500, resulting in a total charge of $16,155, for which he expects to be paid, Doc. 154-1 at 16, but does not provide billing records or other evidence to independently assess the reasonableness of the hours and rate. The orders provided by the parties show the following amounts for McDonald and Danahy for expert fee services (or in some instances for Danahy for representation of a party):

| Attorney | Date | Hourly Rate | Court | Doc. |
|---|---|---|---|---|
| McDonald | 2016 | $375 | Pasco County | Doc. 140-3 at 1−10 |
| Danahy | 2016 | $400 | Pinellas County | Doc. 140-3 at 28−34 |
| Danahy | 2016 | $500 | Orange County | Doc. 140-3 at 35−58 |
| Danahy | 2013 | $425 | Hillsborough County | Doc. 163-4 at 1−5 |
| Danahy | 2011 | $425 | Hillsborough County | Doc. 163-4 at 9−10 |
| Danahy* | 2010 | $400 | Pinellas County | Doc. 163-4 at 11−14 |
| Danahy* | 2010 | $375−400 | Polk County | Doc. 163-4 at 15−18 |
| Danahy* | 2010 | $375 | Tampa Division | Doc. 163-4 at 19−25 |
| Danahy* | 2014−15 | $450 | Charlotte County | Doc. 166-1 at 25−31 |

*Indicates Danahy represented a party instead of serving as a fee expert.*

Because neither the plaintiff nor Danahy offers any reason why he should be paid $100 more an hour than he was paid in the 2016 Pinellas County action, *see* Doc.

---

[8]In the only motion before the Court, the plaintiff prays for "a determination of the following amounts: 1. Reasonable attorney fees of $188,620.00; 2. Reasonable paralegal fees of $37,962.50; 3. A contingency fee enhancement multiplier of no less than 2.0−2.5; 4. Costs in the amount of $25,760.92; and 5. Appraisal costs in the amount of $33,610.50." Doc. 140 at 16−17. Nowhere in the motion does the plaintiff request as part of "costs" fees charged by Danahy, and nowhere in the memorandum does the plaintiff set forth law or analysis on the matter. Although "[a] request for a court order must be made by motion" that "must … state with particularity the grounds for seeking the order … and … the relief sought," Fed. R. Civ. P. 7(b), the defendant concedes it should pay at least some fees for Danahy insofar as it complains only about the reasonableness of the hours spent and the rates charged. In light of the concession and that both parties provide information and argument for a determination of fees to Danahy, requiring the plaintiff to formally amend or supplement the motion is unnecessary.

140-3 at 33, why he should be paid $125 more an hour than McDonald was paid in the 2016 Pasco County action for the same type of expertise, Doc. 140-3 at 9, or why the Orange County action should be persuasive here, the hourly rate agreed to by the defendant—$425—is warranted. And because neither the plaintiff nor Danahy offers billing records or other evidence to independently assess the reasonableness of the hours he spent, a finding of 20 hours (equal to two-and-a-half work days) as reasonable is warranted based on the Court's own experience, the bases for the opinions, and the record under review. *Cf. Norman*, 836 F.2d at 1303 ("[C]ounsel should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity. … [W]here … there is a lack of documentation or testimonial support[,] the court may make the award on its own experience.").

Using the reduced rate and hours, a determination of **$8500** for expert fees is warranted. For an action that was not particularly complex, especially for someone with Danahy's experience (reflected in a $425 hourly rate), that amount is reasonable.

### III.   Recommendations[9]

I recommend:

(1)     granting in part the "Plaintiff's Motion for Determination of Attorney's Fees and Costs," Doc. 140;

---

[9]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

(2)    determining the following amounts:

    (a)    reasonable attorney's and paralegal's fees of **$223,795;**

    (b)    costs of **$25,760.92**;

    (c)    appraisal expenses of **$33,610.50**; and

    (d)    expert fees of **$8500**;

(3)    denying the motion to the extent it seeks a multiplier and any other relief;

(4)    directing the Clerk of Court to enter judgment in favor of Venture Investment Properties, LLC, and against Scottsdale Insurance Company, for $291,666.42 (comprising $223,795 for reasonable attorney's fees, $25,760.92 for costs, $33,610.50 for appraisal expenses, and $8500 for expert fees); and

(5)    directing the Clerk of Court to close the case.

**Entered** in Jacksonville, Florida, on August 8, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:    Counsel of Record